UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
KATHLEEN CERVINI,

                                          Plaintiff,

      -against-

ANDREW SAUL,[1]
Commissioner of Social Security,

                                  Defendant.
----------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**
17-CV-2128 (JMA)

**APPEARANCES:**

    Terry I. Katz, Esq.
    Terry Katz & Associates, P.C.
    505 RXR Plaza
    Uniondale, NY 11556
        *Attorney for Plaintiff*

    Megan J. Freismuth
    Assistant U.S. Attorney
    United States Attorney's Office, EDNY
    271 Cadman Plaza East
    Brooklyn, New York 11201

    Stephen P. Conte
    Regional Chief Counsel – Region II
    Sixtina Fernandez
    Assistant Regional Counsel
    Office of the General Counsel
    Social Security Administration
        *Attorneys for Defendant*

**AZRACK, United States District Judge:**

    Plaintiff Kathleen Cervini ("Plaintiff" or "Cervini") seeks review of the final determination by the Commissioner of Social Security (the "Commissioner"), reached after a hearing before an

---

[1] Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul is substituted for Commissioner Nancy A. Berryhill as the defendant in this suit.

administrative law judge ("ALJ"), denying Plaintiff disability insurance benefits under the Social Security Act. The case is before the Court on the parties' cross-motions for judgment on the pleadings. For the following reasons, Plaintiff's motion for judgment on the pleadings is DENIED, and the Commissioner's cross-motion is GRANTED.

## I. BACKGROUND

### A. Procedural History

Plaintiff filed for disability insurance benefits with the Social Security Administration ("SSA") in September 2013, alleging she was disabled as of May 17, 2012 due to seizures/epilepsy. (Tr. 156.[2])

Plaintiff previously filed an earlier application for disability, which the Appeals Council denied on June 5, 2013. (Tr. 153, 157; see also Tr. 60.) It does not appear that Plaintiff ever appealed this denial.

Following denial of her current disability claim, Plaintiff requested a hearing and appeared with her attorney for an administrative hearing before Administrative Law Judge Jacqueline Haber Lamkay ("the ALJ") on September 8, 2015. (Tr. 70–114.)

In a decision dated September 22, 2015, the ALJ denied Plaintiff's claim, finding that Plaintiff was not disabled between May 17, 2012 through December 31, 2014, her date last insured, because she could perform her past relevant work as a library assistant. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on February 28, 2017. This appeal followed.

### B. Summary of the Relevant Evidence in the Record

Plaintiff was born in 1958 and has had seizures since 1993, when she was 35. (Tr. 24, 35.)

---

[2] Citations to "Tr." refer to pages of the certified administrative record filed by the Commissioner. (ECF No. 19.)

Dr. Neil Schaul, a neurologist, has treated Plaintiff since 1998 for complex partial seizures secondary to temporal lobe epilepsy. (Tr. 24.) In 2002, she was having as many as two seizures daily. (Tr. 290.) In January 2003, she underwent a left temporal lobectomy and amygdalohippocampectory. (Id.) She remained seizure free until June 2004. (Tr. 290.) Since June 2004, Plaintiff has continued to experience grand mal seizures, but they are infrequent. The record indicates that Plaintiff would generally have such a seizure once every one or two years and, at most, once or twice per year. (See Tr. 40, 290.)

Plaintiff also suffers from more minor partial seizures that result in Plaintiff experiencing an "aura" and/or "zoning out." The frequency and impact of these episodes is an issue in this appeal. The evidence concerning the frequency of these less severe seizures is contradictory.

At the September 2015 hearing, Plaintiff testified that she frequently suffered from these episodes. (Tr. 43.) She testified about one two-week period where she had these partial seizures every day. (Tr. 43–45.) She also testified that, at other times, she would have these partial seizures three times a week. (Tr. 43.) Plaintiff also indicated at the hearing that sometimes she would have two or three such seizures a day. (Tr. 43–45.). According to Plaintiff, each of these episodes could last up to fifteen minutes and a period of dizziness and blurred vision, lasing up to 45 minutes, would follow each such episode. (Tr. 45.)

Plaintiff maintains that these episodes caused her to leave her former job as a middle school library clerk in October 2009. (Tr. 39–40, 157, 175–76.) Plaintiff had worked in this position part-time since 2000. (Tr. 158.) Her job involved wheeling around a cart with books and placing those books on the shelf. (Tr. 42.) Plaintiff maintains that she left this job in 2009 because she was suffering from episodes at least three days per week. (Tr. 59.) After she talked to her employer about this issue, she decided to leave voluntarily, reasoning that it was "better safe than sorry."

3

(Tr. 60.)

Plaintiff contends that the treatment records support her testimony of frequent auras and zoning out. Many of the handwritten medical records are difficult to read. However, these records do not clearly indicate that Plaintiff experienced auras and zoning out with the same frequency that Plaintiff reported at the hearing. For example, a treatment note from February 26, 2015 appears to state "report aura 2-3 weeks earlier" in connection with a major convulsion that Plaintiff suffered in January 2015. (Tr. 282.) Another treatment note from November 16, 2010 reports a "zone out" two nights earlier and a vague notation "more than I think." (Tr. 231.) A treatment note from 2008 indicates that Plaintiff's husband informed the doctor that she goes off into her own world, but does not appear to identify the frequency with which this occurred. (Tr. 247.)

In addition to these treatment notes, the record also includes a rough timeline (presumably drafted by Dr. Schaul) that briefly outlines Plaintiff's treatment from 1998 through February 2015. (Tr. 307–09.) This typed document, which appears to give some context to the treatment notes, does not corroborate Plaintiff's testimony concerning the frequency of her episodes. For example, the entry for April 12, 2012, states "no aura" and appears to indicate that Plaintiff's previous "small" seizures occurred in November 2010 and March 2010. (Tr. 309.) The entry for November 14, 2013 indicates "last event in July." (Id.) The March 20, 2014 entry references one minor seizure on March 17, 2014. (Id.) The entry for December 18, 2014 indicates that Plaintiff had experienced three auras since October. (Id.) The February 16, 2015 entry states "aura 3 weeks earlier." (Id.)

The record also includes a number of narrative reports and seizure questions filled out by Dr. Schaul.

A February 2012 narrative report indicates, inter alia, that:

4

> [Following her January 2003 surgery, she] remained seizure free until 6/2004 when she had a convulsive seizure. . . .The next events were in 2006 (major convulsions on 2/28 and 4/19 (during an EEG). There was a suspicion that the patient may have had other events which she was amnestic for. There was another event in 9/2008 and there were two events in 2010 (3/2010 and 7/2010) and other episodes of "zoning out" that may have been seizures. A new AED was added (lamotrigine). An ambulatory EEG in 1/2011 was normal."[3]
>
> She has infrequent but devastating seizures and social professional limitations due to the seizures.

(Tr. 269; Tr. 290.)

Dr. Schaul also drafted two shorter narrative reports in April 2011 and May 2015. (Tr. 272, 289.) These narrative reports are, with the exception of the medications listed, substantively identical.[4] Both reports indicate that Plaintiff "continues to have infrequent seizures. She cannot drive and at times has side effects from the antiepileptic medications (dizziness, sleeplessness, fatigue)."[5] (Id.)

Dr. Schaul also filled out two seizure questionnaires. In a Seizures Impairment Questionnaire dated February 7, 2012, Dr. Schaul indicated that Plaintiff's symptoms would "[p]eriodically" interfere with attention and concentration. (Tr. 275.) Dr. Schaul indicated that he did "not know" if Plaintiff could tolerate work stress. (Tr. 275.) And, while he indicated that Plaintiff's impairments would produce both "good days" and "bad days," he was unable to estimate -how often Plaintiff would likely be absent from work as a result of her condition. (Tr. 276.)-=-- In a Seizures Residual Functional Capacity Questionnaire dated April 21, 2015, Dr. Schaul

---

[3] This ambulatory EEG examination occurred over a two-day period from January 17, 2011 through January 19, 2011. The report indicates that this test was normal. (Tr. 291.) Notably, this test also indicated Plaintiff's last reported episode involving "zoning out" occurred two months earlier, in November 2010. (Id.)

[4] The April 2011 letter, which is addressed to the Binder & Binder law firm, appears to be related to the earlier disability application filed by Plaintiff, which was denied.

[5] The typed timeline, which appears to have been prepared by Dr. Schaul, indicates that, on April 29, 2015, "Gino" (who is the Plaintiff's husband) came to the "office angry and irate about narrative report." (Tr. 309.)

5

indicated, <u>inter</u> <u>alia</u>:

- Plaintiff had one to two seizures per year, with the Plaintiff's most recent seizures occurring in January 2015 and Mar 2013. (Tr. 320.)

- Plaintiff did not suffer any side effects from her seizure medication.[6] (Tr. 322.)

- Plaintiff would sometimes need to take unscheduled breaks during the workday. Dr. Schaul, however, left blank the fields which asked how often this would happen and how long Plaintiff would have to rest before returning to work. (Tr. 323.)

- Plaintiff's condition was likely to produce "good days" and "bad days." Dr. Schaul, however, could not estimate how many days per month Plaintiff was likely to be absent from work due to her condition. (Tr. 323.)

Plaintiff was also examined by Dr. Andrea Pollack, a consultative examiner, in November 2013. (Tr. 264.) Dr. Pollack opined that Plaintiff should avoid heights, activities involving "heavy carrying" or exertion, and activities that put her at risk for a fall. (Tr. 266.) Dr. Pollack also opined that Plaintiff is "restricted in activities which require fine visual acuity bilaterally," based on a vision examination which showed 20/50 vision in both eyes that improved to 20/30 vision with glasses. (Tr. 265.)

## C. **The ALJ's Decision**

The ALJ issued her decision on September 22, 2015, applying the five-step process described below, pursuant to 20 C.F.R. § 404.1520. (Tr. 20–26.) The ALJ first concluded that Plaintiff had not engaged in substantial gainful activity from her alleged onset date of May 17, 2012 through her date last insured of December 31, 2014. (Tr. 22.) At step two, the ALJ found that, through her date last insured, Plaintiff had a severe impairment—specifically, a complex partial seizure disorder. (Tr. 22) At step three, the ALJ determined that Plaintiff's impairment did

---

[6] This statement contradicts statements made in the short narrative reports Dr. Schaul signed in April 2011 and May 2015.

not meet or medically equal the severity of any of the regulation's listed impairments. (Id.)

The ALJ then addressed step four, first determining that Plaintiff retained, with certain additional limitations, the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b). (Tr. 23.) The additional limitations restricted Plaintiff to, inter alia, only occasional stooping, balancing, kneeling, and crouching, and precluded her from occupations that require the use of a motor vehicle. (Tr. 23.)

In making this determination, the ALJ gave considerable weight to Dr. Schaul's findings, with the exception of Dr. Schaul's February 2, 2012 report, which concluded that Plaintiff had "infrequent but devastating seizures and social and professional limitations due to those seizures." (Tr. 24–25.) The ALJ accorded this little weight, reasoning that this report was inconsistent with Dr. Schaul's own impairment questionnaires and the other medical evidence in the record. (Tr. 25.)

The ALJ gave great weight to Dr. Pollack's opinion, except for the restrictions concerning fine visual acuity bilaterally, reasoning that Plaintiff herself alleged no such ongoing limitations and testified, at the hearing, that she does embroidery, needlepoint, crossword puzzles, and reads. (Tr. 25.)

Based on the RFC and the testimony of a vocational expert, the ALJ concluded that, through her date last insured, Plaintiff could perform her past relevant work as a library assistant. (Tr. 26.) Accordingly, the ALJ denied Plaintiff's application for disability insurance benefits.

## II. DISCUSSION

### A. Social Security Disability Standard

Under the Social Security Act, "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

7

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations set out a five-step sequential analysis by which an ALJ determines disability. 20 C.F.R. § 404.1520. The analysis is summarized as follows:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (second alteration in original) (quoting Green–Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)). As part of the fourth step, the Commissioner determines the claimant's RFC before deciding if the claimant can continue in his or her prior type of work. 20 C.F.R. § 404.1520(a)(4)(iv). The claimant bears the burden at the first four steps; but at step five, the Commissioner must demonstrate "there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009); see also Campbell v. Astrue, No. 12-CV-5051, 2015 WL 1650942, at *7 (E.D.N.Y. Apr. 13, 2015) (citing Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999).

**B. Scope of Review**

In reviewing a denial of disability benefits by the SSA, it is not the function of the district court to review the record *de novo*, but instead to determine whether the ALJ's conclusions "'are supported by substantial evidence in the record as a whole, or are based on an erroneous legal

standard.'" Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (quoting Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). Thus, the Court will not look at the record in "isolation but rather will view it in light of other evidence that detracts from it." State of New York ex rel. Bodnar v. Sec. of Health and Human Servs., 903 F.2d 122, 126 (2d Cir. 1990). An ALJ's decision is sufficient if it is supported by "adequate findings . . . having rational probative force." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

**C. Analysis**

Plaintiff advances various arguments attacking the ALJ's decision. None of these arguments are persuasive.

**1. Alleged Failure to Specify the Weight Accorded to Dr. Schaul's Opinions**

Plaintiff contends that the ALJ failed to specify the weight given to Dr. Schaul's opinions. This argument is meritless. The ALJ stated that she gave "considerable" weight to Dr. Schaul's opinions except for Dr. Schaul's February 2, 2012 report, which she accorded "little" weight.

**2. The ALJ's Alleged Failure to Account for Plaintiff's Minor Seizures**

Plaintiff argues that the ALJ failed to consider Dr. Schaul's allegedly numerous accounts of Plaintiff's frequent minor seizures and instead focused only on Plaintiff's grand mal seizures. Relatedly, Plaintiff argues that the ALJ erred in the respective weights that she afforded to Dr.

9

Schaul's opinions in light of the evidence concerning Plaintiff's minor seizures. These arguments are unpersuasive.

An ALJ's decision regarding the weight to be accorded to each medical opinion in the record and how to reconcile conflicting medical opinions is governed by the treating physician rule. 20 C.F.R. § 416.927(c)(2).[7] According to the treating physician rule, if a treating physician's opinion regarding the nature and severity of an individual's impairments is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ will credit that opinion with "controlling weight." 20 C.F.R. § 416.927(c)(2); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

However, an ALJ may discount a treating physician's opinion when that opinion is conclusory, the physician fails to provide objective medical evidence to support his or her opinion, the opinion is inconsistent with the record, or the evidence otherwise supports a contrary finding. See 20 C.F.R. § 416.927(c)(2). The ALJ is required to give "good reasons" in support of the determination. See Schaal v. Apfel, 134 F.3d 496, 503–04 (2d Cir. 1998).

Plaintiff's arguments fail for the reasons set forth below. The ALJ's assignment of various weights to the medical opinions as well as her ultimate RFC determination were supported by substantial evidence.

First, Dr. Schaul's questionnaires and letters did not indicate that Plaintiff "frequently" suffered minor seizures. Nor did Dr. Schaul opine that Plaintiff's minor seizures limited her in a manner that is inconsistent with the ALJ's RFC determination. As set forth earlier, in the seizure

---

[7] In 2017, new SSA regulations came into effect. The newest regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Plaintiff's claim was filed in 2013, the Court applies the regulations that were in effect at the time of filing. See, e.g., Ogirri v. Berryhill, No. 16-CV-9143, 2018 WL 1115221, at *6 n.7 (S.D.N.Y. Feb. 28, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); Rousey v. Comm'r of Social Sec., No. 16–CV–9500, 2018 WL 377364, at *8 n.8 & *12 n. 10 (S.D.N.Y. Jan. 11, 2018) (same).

10

questionnaires he filled out, Dr. Schaul was unable to estimate how often Plaintiff's "bad days" would cause her to miss work. Similarly, in the April 2015 questionnaire, Dr. Schaul indicated that Plaintiff would sometimes need to take unscheduled breaks during the workday, but Dr. Schaul did not specify how often this would happen and how long Plaintiff would have to rest before returning to work. (Tr. 323.)

Second, the ALJ also relied on the opinion of Dr. Pollack, whose conclusions concerning the limitations resulting from Plaintiff's seizure disorder support the ALJ's RFC determination.

Third, Plaintiff's arguments are premised on the erroneous assumption that the handwritten medical records clearly corroborate Plaintiff's testimony that she experienced frequent auras and zone-outs—they do not. Some of the handwritten notes appear to indicate the contrary, while others are, at best, vague. Additionally, the typed timeline in the record appears to affirmatively contradict Plaintiff's claim of frequent zone-outs and auras. Accordingly, there was ample evidence in the record to support the ALJ's RFC determination and the relative weights that she accorded to Dr. Schaul's submissions.[8]

Fourth, Dr. Schaul's February 2, 2012 report indicated that Plaintiff had unspecified "social and professional limitations." The ALJ did not err in according limited weight to that report and the vague limitations identified therein. All of these points show that the ALJ's decision was well-

---

[8] Plaintiff appears to argue that Dr. Schaul's underlying treatment notes reflect a frequency of these zone-outs and auras that is not even reflected in Dr. Schaul's opinions. In fact, at one point, Plaintiff makes the puzzling argument that, based on Dr. Schaul's treatment notes, "it is clear that Plaintiff['s] seizure disorder is much more limiting tha[n] he might have deemed himself able to assess [in the February 2012] medical source statement." (Pl. Mem. at 8.) Not only does the Court disagree with Plaintiff's view of the treatment notes, but it is certainly not error, on this record, for the ALJ's RFC determination to exclude limitations that are not even reflected in the treating physician's opinion. Plaintiff goes on to assert that Dr. Schaul's later questionnaire, which was completed in 2015, "indicates that Plaintiff's conditions are more severe tha[n] previously described." (Id.) However, as discussed earlier, Dr. Schaul's 2015 questionnaire also failed to specify the extent of Plaintiff's limitations.

11

supported by the record.[9]

Plaintiff also contends that the ALJ erred by not expressly considering and acknowledging the relevant factors for analyzing opinion evidence.  This argument is meritless.  In weighing an opinion from a treating physician, an ALJ must consider various factors, including: "the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the relevant evidence, particularly medical signs and laboratory findings, supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." Burgess, 537 F.3d at 128 (internal quotations and alterations omitted).  However, even if an ALJ fails to apply these factors "explicitly" in a decision, the ALJ's decision should be affirmed if a reviewing court conducts "a searching review of the record" and finds "that the substance of the treating physician rule was not traversed." Danza v. Comm'r of Soc. Sec., No. 18-cv-6841, 2019 WL 6033097, at *2 (E.D.N.Y.

---

[9]  The ALJ set forth good reasons for the relative weights she accorded to Dr. Schaul's various submissions and findings.  However, as often occurs, both this opinion and the government's brief flesh out those reasons more fully and supplement them.  Addressing this scenario, Judge Cogan has observed,

> this case presents the not-infrequent situation where the Commissioner has done a better job in court of defending and substantiating the decision of the ALJ based on the record than does the decision of the ALJ itself. . . [T]his Court cannot affirm the ALJ on grounds different than those on which she relied. But that is not the situation here.  The Commissioner is seeking affirmance on the very grounds expressed by the ALJ—that the ALJ properly discounted the opinions of the treating physicians and that plaintiff was not a credible witness—but the Commissioner has supplemented the ALJ's reasoning in support of those grounds.
>
> It seems to me that a reviewing court confronted with this situation might ask: (1) whether the ALJ articulated sufficient grounds for her conclusions to permit meaningful judicial review; and (2) in light of the additional reasoning that the Commissioner offers on review and the plaintiff's response to that reasoning, whether a remand for rehearing would allow a reasonable possibility that an ALJ might reach a different conclusion, without which the remand would be an exercise in futility.

Battaglia v. Berryhill, No. 17-CV-3852 (BMC), 2018 WL 1054371, at *1 (E.D.N.Y. Feb. 23, 2018) (citations omitted).

Given the strength of the reasons and the analysis provided by the ALJ, the Court does not believe that it is even necessary to analyze the ALJ's weighing of the medical opinions and credibility analysis under the above framework.  In any event, the Court finds that the ALJ articulated sufficient grounds to permit meaningful judicial review and that, in light of the ALJ's reasoning and analysis and additional reasoning set forth by the Commissioner and in this opinion, there is not a reasonable possibility that an ALJ would reach a different conclusion on remand.

Nov. 14, 2019) (citing Estrella v. Berryhill, 925 F.3d 90, 96 (2d Cir. 2019)).

Here, the ALJ expressly stated that she had considered opinion evidence in accordance with "20 C.F.R. 404.1527 and SSRs 96-2p, 95-6p, 96-6p, and 06-3p." (Tr. 23.) Although she did not go on to explicitly analyze each of the relevant factors, the ALJ's analysis was still sufficient.

### 3. Duty to Develop the Record and Alleged Cherry-Picking of Medical Opinions

Plaintiff argues that the ALJ was "not free to pick and choose what aspects of a treating physician's opinion were entitled to greater weight than others" and that, if the ALJ felt that Dr. Schaul's opinion was inconsistent in some respects, the ALJ had a duty to contact Dr. Schaul for additional information. (Pl. Mem. at 14.)

It is true that an ALJ has an affirmative duty to develop the record where there are deficiencies and "clear gaps in the administrative record." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999); 20 C.F.R. § 416.912(d). However, "the flip-side of this same proposition" is that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Petrie v. Astrue, 412 F. App'x 401, 406 (2d Cir. 2011) (quoting Rosa, 168 F.3d at 79 n.5). The ALJ's duty to develop the record exists even when a claimant is represented by counsel. Rosa, 168 F.3d at 79.

Here, the ALJ did not fail to develop the record, which contains multiple opinions from Dr. Schaul, including two seizure questionnaires, two letters, and one narrative report. It is absurd to argue that, in these circumstances, the ALJ was required to contact Dr. Schaul for further information.

Relatedly, Plaintiff argues that the ALJ erred because she was "not free to pick and choose what aspects of a treating physician's opinion were entitled to greater weight than others." (Pl.

13

Mem. at 14.) "An ALJ is certainly permitted to assign different weights to different portions of a medical opinion, but 'when the ALJ uses a portion of a given opinion to support a finding, while rejecting another portion of that opinion, the ALJ must have a sound reason for this discrepancy.'" Linder v. Saul, No. 17-CV-727, 2020 WL 224536, at *6 (E.D.N.Y. Jan. 14, 2020) (quoting Artinian v. Berryhill, No. 16-CV-4404, 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018)).

Here, the ALJ did not assign different weights to different portions of a single opinion. Rather, the ALJ simply accorded different weights to different reports from Dr. Schaul. Moreover, as explained earlier, the ALJ articulated sounds reasons for doing so.

### 4. Dr. Pollack's Opinion Concerning Vision Limitations

Dr. Pollack opined that Plaintiff is "restricted in activities which require fine visual acuity bilaterally," based on a vision examination which showed 20/50 vision in both eyes that improved to 20/30 vision with glasses. (Tr. 265.) At the hearing, however, Plaintiff admitted that she is able to do stitchery, needlepoint, embroidery, puzzles, crossword puzzles, and word searches. (Tr. 54.) She also testified that she goes on her computer and reads newspapers, magazines, and books. (Tr. 55.) And, in her function report, Plaintiff, who wears glasses for long distance, reported that she had "no problem" seeing. (Tr. 168.) Ultimately, the ALJ did not include Dr. Pollack's vision limitations in the determination.

Plaintiff contends that the ALJ erred when she gave little weight to the vision limitations in Dr. Pollack's opinion. Plaintiff maintains that the ALJ, who is not a physician, was not qualified to discount Dr. Pollack's opinion simply because Plaintiff testified that she was able to do needlepoint and crossword puzzles. Plaintiff's brief stresses that, during her examination, Plaintiff also informed Dr. Pollack about these activities and that, nevertheless, Dr. Pollack still found visual limitations. Accordingly, Plaintiff asserts that the ALJ erred by not finding at, step two, that

14

Plaintiff had a severe vision impairment. Plaintiff also maintains that the ALJ erred because—whether or not her vision limitations rose to the level of a severe impairment—these visual limitations should have been included in Plaintiff's RFC.

The Court finds that the ALJ did not err in analyzing the vision limitations discussed in Dr. Pollack's opinion. It was not error, on this record, for the ALJ to conclude that Plaintiff did not have a severe vision impairment. See 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities").[10] And, even assuming arguendo that the ALJ should have found a severe vision impairment at step two, any error in that regard would be harmless because the ALJ also considered the evidence concerning alleged vision limitations at step four. See O'Connell v. Colvin, 558 F. App'x 63, 65 (2d Cir. 2014). Most importantly, the ALJ did not err by declining to include any vision limitations in Plaintiff's RFC determination. As the ALJ stressed, Plaintiff did not even allege any such ongoing limitations concerning her vision. Additionally, Plaintiff's function report stated she had "no problem" seeing and, at the hearing, she admitted engaging in a lengthy list of activities such as needlepoint and embroidery, puzzles, and reading. (Tr. 54–55.) This was not a situation where the ALJ needed a contrary medical opinion in order to reject the vision limitations found by Dr. Pollack, a consultative examiner who only examined Plaintiff once.

Notably, Plaintiff did not testify that any vision issues caused her to leave her job shelving books at a library in 2009 or that any such issues would prevent her from performing that job or any tasks related to that job. Thus, there is simply no indication that she had vision limitations that would render her unable to perform her past relevant work.

---

[10] The Court is relying on the prior version of this regulation, which—while still applicable to this instant case—was amended effective until March 27, 2017. See n. 7 supra.

15

### 5. The ALJ's Credibility Analysis

Finally, Plaintiff argues that the ALJ's credibility finding was insufficient.

The ALJ explained that:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Tr. 24.) The ALJ's decision recounted the essential points from Plaintiff's testimony and various portions of the record that did not support some of that testimony. This includes the opinions of Dr. Schaul and Dr. Pollack credited by the ALJ (which are discussed earlier) as well as Plaintiff's own testimony and statements regarding the "fairly broad range of daily activities" recounted in the ALJ's decision. (Tr. 25.)

"Although the ALJ's reasoning could have been better articulated and more thorough, it is clear to the Court that the ALJ's credibility finding was amply based on the record." Douglas v. Berryhill, No. 17-CV-00694, 2019 WL 1017341, at *7 (E.D.N.Y. Mar. 4, 2019); see Battaglia, 2018 WL 1054371, at *4 ("[I]t would have made for easier review if the ALJ had written: 'I find plaintiff not credible for the following reasons,' and then listed each of the points set forth above. But most of these are in her decision, and no particular stylistic form is required to facilitate judicial review. Under these circumstances, remanding for a re-determination of credibility would be a futile gesture. The ALJ's determination of credibility was amply based on the record."). Remand for further clarification as to which specific statements the ALJ found incredible and precisely why is unnecessary. The ALJ's credibility analysis was sufficient and supported by substantial evidence. Remand is not required here.

16

## III.  CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for judgment on the pleadings and GRANTS the Commissioner's motion for judgment on the pleadings.  The Clerk of the Court is directed to enter judgment in favor of the Commissioner and close the case.

**SO ORDERED.**

Dated:  May 21, 2020
Central Islip, New York

                                                    _____/s/ (JMA)_____
                                                    JOAN M. AZRACK
                                                    UNITED STATES DISTRICT JUDGE